**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**KRISNEY A.,**

                **Plaintiff,**

     **v.**                          **Civil Action 2:23-cv-1238**
                                       **Judge Sarah D. Morrison**
                                       **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

                **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Krisney A., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.    BACKGROUND

In December 2020, Plaintiff protectively applied for DIB and SSI, alleging that she was disabled beginning April 25, 2020, due to ADHD (attention deficit hyperactivity disorder), fibromyalgia, fatty liver, chronic liver, PCOS (polycystic ovary syndrome), GERD (gastroesophageal reflux disease), sleep apnea, asthma, plantar fasciitis, and "lympoma" on her brain. (R. at 302–15, 370). After her applications were denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing. (R. at 36–78). Ultimately, the ALJ denied Plaintiff's applications in a written decision on April 27, 2022. (R. at 13–35). When the Appeals Council denied review, that denial became the Commissioner's final decision. (R. at 1–7).

Next, Plaintiff brought this action.  (Doc. 1).  As required, the Commissioner filed the administrative record, and the matter has been fully briefed and is ripe for review.  (Docs. 7, 10, 11, 12).

### A.   Relevant Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as follows:

> [Plaintiff] testified that she is unable to work due to problems with the right wrist, including constant pain, swelling, and numbness, with dropping of items she is trying to hold. [Plaintiff] also endorsed daily nausea and vomiting, albeit with some days better than others, in addition to migraine headaches which cause light and sound sensitivity, dizziness, and nausea. During migraines, [Plaintiff] will sleep in a dark room, noting that headaches can last for between four hours to a whole day. She stated she takes as needed medications for her migraines, using them about three times per week. She also reported asthma symptoms with use of an inhaler, with exacerbations related to cold, heat, and walk for 20 minutes. She also noted nausea and shaking due to her diabetes. [Plaintiff] reported diarrhea and dizziness from her medications, specifically Metformin.

> [Plaintiff] endorsed experiencing anger and mood issues often, as well as depression and crying spells, with sleep disturbance due to stress and her medical problems. She stated she used oxygen during her sleep for four years but that she stopped using it as it was making her sick. She stated she has no concentration ability and that she has someone constantly telling her to focus. She indicated she does not like interacting with others and gets anxious or angry in those situations.

> During a typical day, [Plaintiff] reported poor energy, but is still able to work part time at Kroger, between 9-12 hours per week. [Plaintiff] indicated she is able to read a newspaper or job application with help, can complete a job application with help, is able to read a magazine with help with some words, and has help from her mother in managing her bank account. [Plaintiff] stated she lives with her parents because his is unable to live alone as she forgets to shower, eat, take medications, attend doctors' appointments, and required help for rides.

(R. at 23).

### B.   Relevant Medical History

The ALJ summarized Plaintiff's medical records as to her relevant physical impairments as follows:

> Emergency department notes on April 26, 2020, showed complaints of left lower leg pain in the context of a morbidly obese body habitus (Exhibit 2F, pages 94-95).

Physical examination as notable for a BMI of 49.7, elevated blood pressure, a steady gait, 5/5 lower extremity strength, with pain with light palpation and stroking of the left lower leg (Exhibit 2F, pages 96-97). [Plaintiff] was treated symptomatically, with nerve irritation suspected, and crutches provided to help with ambulation (Exhibit 2F, page 95).

Neurology notes in January 2021, showed [Plaintiff] with a history of lipoma of the brain, with headaches and nausea and vomiting (Exhibit 11F, pages 10). Physical examination was notable for a BMI of 50.5, 5/5 muscle strength with the exception of an untested right arm due to a recent fall, normal motor bulk and tone, and a normal gait (Exhibit 11F, pages 14-15). Prior brain images were discussed with [Plaintiff]'s lipoma assessed as tiny and likely of no clinical significance (Exhibit 11F, page 16). [Plaintiff] was ordered to undergo evaluative tilt table testing as well as endocrinology assessment for further work up (Exhibit 11F, page 16).

Endocrinology notes in January 2021, showed [Plaintiff] was evaluated for weight gain, with physical examination notable for a BMI of 50.05, unremarkable breath sounds, and was otherwise unremarkable (Exhibit 12F, pages 81-82). [Plaintiff] was advised to restart Phentermine (Exhibit 12F, pages 77). In a physical therapy note in the same month, [Plaintiff] was noted has having left knee pain, waiting on a new brace, and having not attended physical therapy in over a month due to work and an alleged fall (Exhibit 12F, page 84). Records showed [Plaintiff] had only attended two visits since November 2020, but despite her inconsistent attended indicated she had approximately 40% improvement in knee pain (Exhibit 12F, page 85). Improved attendance and compliance was counseled (Exhibit 12F, page 85). Unfortunately, [Plaintiff] was discharged after only four total visits and last being seen on January 12, 2021, due to inactivity (Exhibit 12F, page 89).

On March 8, 2021, [Plaintiff] underwent a medical consultative evaluation with Mark Weaver, M.D., alleging disability due to fibromyalgia, asthma, left knee and right wrist problems, obstructive sleep apnea, foot problems, abdominal problems, and mental difficulties (Exhibit 5F, page 2). [Plaintiff] was noted as a poor medical historian, noting no treatment for fibromyalgia symptoms, no use of any assistive devices for ambulation but intermittent use of a left knee brace, use of an Albuterol inhaler, and a history of orthotic use (Exhibit 5F, page 3). Physical examination was notable for a calculated BMI of 48.3 based on a height of 6 feet 2 inches and weight of 376 pounds; ambulation with a stiffened gait and left limp with complaints of low back and left knee pain; slight shortness of breath and some fatigue after walking 40 feet up and down the hallway; a few scattered wheezes on lung auscultation; ½ inch atrophy of the left lower extremity; give way weakness in the right wrist and hand with wrist pain inhibition; left knee joint pain inhibition; restricted motion in both shoulders, in the right wrist, and left knee; some swelling and tenderness over the dorsal right wrist joint; and tenderness to palpation over the medial left knee and patella with mild anterior-posterior laxity in drawer testing noted and the sub-patella crepitus to palpation on active motions (Exhibit 5F, pages 4-6, 9-13). Dr. Weaver also noted several tender trigger points greater

than 11 out of 18 in total; bilateral plantar foot tenderness to palpation; and constant mild involuntary spasm to inspection and palpation of the lower cervical, upper thoracic trapezius muscle area and lumbar paravertebral muscle region (Exhibit 5F, page 6). Dr. Weaver diagnosed: probable chronic asthma; probable fibromyalgia syndrome; probable chronic left knee pain possibly arthritis by medical history; probable chronic right wrist pain by medical history; probable chronic bilateral plantar foot pain and plantar fasciitis by medical history; possible easy fatigue and exhaustion; and possible obstructive sleep apnea by medical history (Exhibit 5F, page 7). Dr. Weaver opined: that all [Plaintiff]'s problems were compounded by her being overweight and, "would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, reaching, climbing, squatting, stooping, crouching, kneeling, crawling, lifting, carrying and travel" and "would probably be able to perform physical activities involving handing objects but without force gripping of the right hand, speaking, hearing, and following directions" (Exhibit 5F, page 7).

Gynecology notes in August 2021, showed [Plaintiff] continued to have an obese body habitus based on a BMI of 49.3, with no back tenderness, intact range of motion, and clear breath sounds bilaterally (Exhibit 7F, page 8-9). In September 2021, [Plaintiff] was seen for complaints of headache and sleep apnea, with imaging in the same month revealing an unchanged lateral ventricle choroid plexus lipoma (Exhibit 9F, pages 1-2). [Plaintiff] noted 0-2 headaches per week, exacerbated by light, with no expressed interest in prophylactic medication but rather desiring abortive medications (Exhibit 9F, page 2). Neurological examination was notable for no cognitive impairment, no involuntary movements, intact coordination and intact gait (Exhibit 9F, page 2). [Plaintiff] was prescribed Imitrex for use as needed for migraines (Exhibit 9F, page 2).

Endocrinology notes in September 2021, reflected a new diagnosis of diabetes, as well as having been off Phentermine for 6 months and [Plaintiff] requesting a refill (Exhibit 12F, pages 97-98). [Plaintiff] was provided a refill and counseled regarding lifestyle changes (Exhibit 12F, page 98). In October 2021, [Plaintiff]'s Phentermine dosage was adjusted due to tachycardia and concerns regarding nausea and vomiting (Exhibit 12F, page 110).

On January 20, 2022, [Plaintiff] was seen for a physical, with noted of a BMI of 51.9, normal breath sounds, normal musculoskeletal range of motion, and normal and symmetric reflexes (Exhibit 7F, pages 19-20). [Plaintiff] was counseled regarding weight loss and lifestyle modifications, and recommended to obtain vaccinations (Exhibit 7F, page 21).

(R. at 23–25).

The ALJ summarized and evaluated the medical opinions pertaining to Plaintiff's mental impairments as follows:

4

Turning to [Plaintiff]'s alleged mental impairments, the record reflects a history of anxiety and depressive symptoms, exacerbated by stressors including work and family concerns (Exhibits 1F; 3F, pages 54-63).

Notes on April 26, 2020, reflected [Plaintiff] alert and oriented to person, place, and time; with normal mood, normal thought content, and normal judgement (Exhibit 2F, pages 97-98). Behavioral health notes in June 2020 showed [Plaintiff] reporting fighting with her parents due to their expectation of her, and admitting that there, "is more she can do and should do" (Exhibit 3F, page 64). Mental status examination was notable for cooperative behavior, normal speech, and anxious mood, normal thought processes, alert sensorium, and fair insight and judgement (Exhibit 3F, page 64). [Plaintiff] indicated she would help her mother clean the house, sit with her elderly grandmother when asked, and work on coping skills in the interim before her next visit (Exhibit 3F, page 64).

In a note dated July 20, 2020, [Plaintiff] was identified as having "comprehension issues" however it was unclear from the record whether this was a self-report or based on objective indicia as no mental status examination findings were reported (Exhibit 3F, pages 50-52). Telehealth notes in August 2020, showed [Plaintiff] required a significant amount of prompting to engage, that she had been helping her grandmother and doing dishes when asked, as well as being able to communicate with friends via text (Exhibit 3F, page 70). Mental status examination was notable for an anxious and constricted mood but was otherwise unremarkable, with [Plaintiff] counseled regarding motivation and coping skills (Exhibit 3F, page 70).

On March 24, 2021, [Plaintiff] underwent a psychological consultative evaluation with Gregory Johnson, Ph.D., alleging disability due to inability to focus and a history of attention deficit/ hyperactivity disorder, and anxiety (Exhibit 6F, pages 2-3). [Plaintiff] also reported a history of special education services under an Individualized Education Program, and is able to read albeit with help with some words from her mother (Exhibit 6F, page 4). Regarding her daily routine, [Plaintiff] indicated she wakes between 6-730am, is able to attend to personal hygiene, works for 2-3 hours per day, will read and watch television in the afternoon, and after dinner with read and draw until bedtime (Exhibit 6F, page 5). [Plaintiff] expressed hobbies including drawing, doing crafts, and readings; is able to cook; and changes clothes and bathes two times weekly (Exhibit 6F, pages 5-6). Mental status examination was notable for logical and coherent responses; a depressed mood; a restricted range of affect; no evidence of psychomotor agitation or psychomotor retardation during the evaluation; recalled 2/3 words after a five minute delay; repeated 6 digits in forward order and 3 digits in reverse order for immediate memory; was able to perform serial three exercise; with estimated below average range of intellectual functioning (Exhibit 6F, pages 6-10). Dr. Johnson diagnosed attention deficit hyperactivity disorder and mild major depressive disorder and opined: [Plaintiff] has elevated risk for dysfunction in remembering and carrying out instructions; [Plaintiff] has elevated risk for dysfunction in maintaining

attention and concentration and maintaining pace and persistence in both simple and multi-step tasks in the workplace; has elevated risk for inappropriate responses to expected interactions with coworkers and to the expected scrutiny from supervisors; and has a mostly elevated risk for inappropriate responses to expected workplace pressures (Exhibit 6F, pages 10-11).

On January 20, 2022, [Plaintiff] was seen for a physical, with psychiatric examination noted showing [Plaintiff] as alert and oriented to person, place, and time, normal speech, normal behavior, normal thought content, and normal judgment (Exhibit 7F, page 20). Depression screening was entirely negative and no mental health related complaints were reflected during the visit (Exhibit 7F, pages 18-23).

(R. at 25–26).

## C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through September 30, 2025. (R. at 18). She has not engaged in substantial gainful employment since April 25, 2020, the alleged onset date. (*Id.*). The ALJ also determined that Plaintiff has the following severe impairments: osteoarthritis; fibromyalgia; morbid obesity; migraine headaches; obstructive sleep apnea; and anxiety disorder. (R. at 19). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meets or medically equals a listed impairment. (*Id.*).

The ALJ assessed Plaintiff's residual functional capacity ("RFC") as follows:

After careful consideration of the entire record, [the ALJ] finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 404.1567(b) except: [Plaintiff] can engage in no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, crouching, kneeling; but no crawling. [Plaintiff] cannot work at unprotected heights or around hazardous machinery nor perform commercial driving. [Plaintiff] can occasionally operate foot controls with the bilateral lower extremities, can frequently handle and finger with the non-dominant right upper extremity. Claimant can have concentrated exposure to extreme cold, heat, humidity, wetness, pulmonary irritants, exposure to vibrations, or concentrated exposure to loud noise (defined as construction level), and must avoid flashing or strobing lights. [Plaintiff] can perform simple routine tasks, with occasional interaction with the public, coworkers and supervisors. [Plaintiff] can have no fast-paced production such as assembly line or work where machines sets the pace; work is of a variable rate. [Plaintiff] can engage in occasional decision making, can

6

tolerate occasional changes in the work setting, with no strict production requirements, hourly requirements; rather should have end of day work goals. [Plaintiff] should have no tandem tasks and instructions should be more of a verbal or demonstration nature.

(R. at 22).

As for the allegations about the intensity, persistence, and limiting effects of Plaintiff's symptoms, the ALJ found that Plaintiff's symptoms are "not entirely consistent with the medical evidence and other evidence in the record." (R. at 26).

The ALJ determined that Plaintiff is unable to perform her past relevant work as a bagger. (R. at 29). The ALJ relied on testimony from a Vocational Expert ("VE") to determine that given Plaintiff's age, education, work experience, and RFC, she was able to perform work that existed in significant numbers in the national economy, such as a marker, routing clerk, or a mail clerk. (R. at 29–30). Consequently, the ALJ concluded that Plaintiff has not been under a disability, as defined in the Social Security Act, since April 25, 2020. (R. at 30).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes*

*v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her Statement of Errors, Plaintiff contends that the ALJ violated 20 C.F.R. § 404.1520c during her evaluation of the medical source statements completed by consultative physical examiner, Mark Weaver, M.D.; the consultative psychological examiner, Gregory Johnson, M.D.; and the prior administrative medical findings from the state agency psychology consultants, Robyn Murry-Hoffman, Psy.D., and Jennifer Whatley, Ph.D., by improperly evaluating their opinions for their consistency and supportability.  (Doc. 10 at 6–14).  Plaintiff also argues that the ALJ inadequately considered the state agency psychology consultants' opinion that Plaintiff should be limited to "minimal and superficial interaction with others."  (*Id.* at 6, citing R. at 171, 182, 194, 204).

The Commissioner counters that the ALJ applied proper legal standards and substantial evidence supports the ALJ's decision.  (Doc. 11).

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1) (2012).  A claimant's RFC assessment must be based on all the relevant evidence in her case file.  *Id.*  The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1] 20 C.F.R. § 404.1513(a)(1)–(5).  Regarding two of these categories—medical opinions and prior

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (*see* § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§ 404.1513(a)(2), (5).

8

administrative findings—an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." § 404.1520c(c)(1) – (5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. § 404.1520c(b)(2).

When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). And although an ALJ may discuss how she evaluated the other factors, she is not generally required to do so. *Id*. If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [she] considered the other most persuasive factors…." § 404.1520c(b)(3).

In essence, the role of the ALJ is to articulate how she considered medical opinions and how persuasive she found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20

CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).  The role of the Court is not to reweigh the evidence but to make sure the ALJ considered the proper factors and supported her conclusion with substantial evidence.  *Id.,* at *14.

### A. State agency psychologists, Robyn Murry-Hoffman, Psy.D., and Jennifer Whatley, Ph.D.

Plaintiff challenges the ALJ's treatment of the state agency psychologists' opinions  (Doc. 10 at 7).  The ALJ found the prior administrative medical findings of Drs. Murry-Hoffman and Whatley to be "somewhat persuasive."  (R. at 28).  When evaluating their assessments, the ALJ determined:

> The [ALJ] has also considered the State agency psychological consultant's opinions which initially and at reconsideration found [Plaintiff] able to complete 2-3 step tasks that do not require sustained periods of focus and concentration and are not production driven; is capable of minimal and superficial interactions with others; and can adjust to infrequent and minor changes in tasks (Exhibits 1A; 2A; 5A; 6A). The consultant's specified that [Plaintiff] maintains the capacity to perform 2-3 tasks in a low stress work environment where changes are infrequent and contact with others is intermittent and superficial, and should not be held to strict production demands or scheduling (Exhibits 1A; 2A; 5A; 6A). The [ALJ] has found these assessments somewhat persuasive. While the evidence of mental health treatment during the period at issue is minimal, the [ALJ] has limited [Plaintiff] as reflected in the residual functional capacity articulated above. The [ALJ] has not incorporated undefined language including "minimal and superficial interactions with others" as they are nonspecific qualifying terms that do not adequately describe function consistent with applicable policy and/or regulation nor usefully conveys the extent of [Plaintiff]'s limitations.

(R. at 27–28).

### 1. Supportability and Consistency

At the outset, the Undersigned notes the inherent lack of clear delineation between supportability and consistency when an ALJ evaluates the opinion of a reviewer—like a state agency physician—who forms her opinion after a holistic review of the medical evidence of record.  Consider, for example, a case in which there has been little or no change to the medical

evidence of record between the time the reviewer issues her finding and the ALJ conducts a hearing.  In that instance, the evidence upon which the reviewer supported her finding—the complete medical record at the time of her finding—would be virtually identical to the evidence with which the opinion is consistent or inconsistent—the complete medical record at the time of the ALJ's hearing.  The ALJ is left in a position in which she is unable to consider supportability without simultaneously addressing consistency, and vice versa.  A plaintiff might semantically allege error in such a case—saying that the ALJ only addressed consistency because she compared the reviewer's opinion to the entirety of the record.  But the ALJ would have still fulfilled the purpose of the regulation: to give a fulsome review to medical opinions and prior administrative findings, paying particular attention both to how the opinions are internally supported and explained, and how they compare to the record as a whole.

Contrast this with a medical opinion rendered by a treating physician.  There, supportability and consistency are more clearly distinguished.  The physician supports (or not) her opinion with her own treatment notes, objective medical findings, and experience with the plaintiff.  Her opinion is consistent (or not) with the entire universe of the medical evidence of record.

Other courts in this Circuit have considered this facet of the supportability and consistency framework.  In *Vaughn v. Commissioner of Social Security*, the Western District of Tennessee addressed an allegation that an ALJ had not properly assessed the supportability of opinion evidence provided by a physician acting as a "reviewing specialist[ ] . . . ."  No. 20-CV-1119-TMP, 2021 U.S. Dist. LEXIS 134907, at *24 (W.D. Tenn. July 20, 2021).  The court found that consistency had sufficiently been addressed by the ALJ, because she explicitly detailed why the opinion was inconsistent with other aspects of the record.  *Id.* at *25–27.  But, the ALJ had not meaningfully discussed supportability.  *Id.* at *27–32.

Notably, however, the physician based his opinion on other medical records "he reviewed, which completely encompasse[d] the relevant period of discovery." *Id.* at *30–31.  In other words, the physician operated in the manner of a state agency reviewer, conducting a holistic review of the medical evidence of record before rendering an opinion.  So, the court determined that while the ALJ had not observed 20 C.F.R. § 404.1520c to the letter, she had:

> achieved the regulations' goal of providing notice to [the plaintiff] of why [the physician's] opinion was not persuasive.  [The physician]'s opinion was entirely predicated on a review of [the plaintiff]'s medical history and, when recounting that same medical history, the ALJ identified several instances where [the plaintiff]'s medical records did not support a finding of disability.  As such, the ALJ's discussion of [the plaintiff]'s medical history is, in essence, a discussion of whether the evidence [the physician] reviewed could actually support his conclusions.  Thus, while not being a direct attack on the supportability of [the physician]'s opinion as contemplated by the regulations, the ALJ's opinion is only one step removed from articulating why she believed the basis for [the physician]'s opinion was faulty, i.e. an explanation of the supportability factor.

*Id.* at *34–35.

Accordingly, the court concluded that any error in the assessment of the opinion was harmless, and remand was not necessary.  *Id.* at *36.  This same harmless-error analysis should apply to an ALJ's decision which clearly discusses the consistency of a state agency reviewer's opinion when that same opinion was formed upon records which encompassed the relevant period of discovery and the ALJ elsewhere discusses those records in detail.

In this case, Plaintiff argues that the ALJ did not discuss consistency or supportability in her assessment of the state agency psychology consultants' opinions concerning Plaintiff's limitations on social interactions.  (Doc. 10 at 7).  Plaintiff contends that the ALJ "tossed those factors to the side" in her analysis.  (*Id.*).

Yet the Undersigned finds that the ALJ's decision fulfilled the requirements of the regulations.  *See* 20 C.F.R. § 404.1520c(b)(2).  The ALJ discussed supportability when she noted the limited treatment records available during the relevant time and when she compared the

consultants' determinations to the evidence they reviewed.  The ALJ discussed consistency when she analyzed later treatment evidence, unavailable to the state agency psychology consultants, and compared them to the record as a whole.

Dr. Murry-Hoffman completed a disability determination on April 24, 2021.  (R. at 171, 182).  In forming her opinion, she reviewed mental and physical health records available up to that date.  (R. at 164–65, 175–76).  Then, on June 13, 2021, Dr. Jennifer Whatley completed another disability determination.  (R. at 193–95, 203–05).  Dr. Whatley reviewed the same mental health records that were available to Dr. Murry-Hoffman.  (R. at 188, 198).  The consultants determined Plaintiff is capable of only "minimal and superficial interactions with others."  (R. at 171, 182, 194, 204).  Yet the ALJ noted elsewhere in her opinion that the medical records reviewed by the consultants show that Plaintiff helped care for her grandmother, assisted with household chores, texted with friends, and was cooperative with mental health professionals during the relevant time period.  (R. at 25–26, citing R. at 635–36, 675–84; *see* R. at 165, 176, citing R. at 619–20, 635–36, 675–84).  The ALJ determined that these activities "suggest[ed] greater functional ability than otherwise alleged" by the state agency psychology consultants and other medical sources.  (R. at 27.)

The ALJ further explained that the "evidence of mental health treatment during the period at issue [was] minimal," leaving the consultants and the ALJ with Plaintiff's subjective reports.  (R. at 28).  The record shows that the consultants' disability determinations referenced only three appointments concerning mental health: a psychological evaluation in January 2020, a mental health appointment in August 2020, and a disability assessment by Dr. Gregory Johnson, which the ALJ elsewhere found "unpersuasive."  (R. at 28; *see e.g.*, R. at 165, 176, 188, 198, citing R. at 619–20, 635–36, 675–84).  As such, the consultants' opinions on Plaintiff's social limitations were

13

based largely on Plaintiff's own subjective reports within those medical records.  (R. at 171, 182, 194, 204).  The ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. at 26).  This reasoning shows that the ALJ analyzed Plaintiff's own statements, which were used to support the consultants' findings.

The consultants also failed to explain discrepancies in their own findings, and the ALJ accordingly determined that their opinions were "nonspecific" and did not "usefully convey[] the extent of [Plaintiff's] limitations."  (R. at 28).  While the consultants noted that Plaintiff described strained and avoidant interactions with coworkers, they also found Plaintiff "not significantly limited" in this area.  (R. at 171, 182, 194, 204).  Furthermore, despite Plaintiff's report that she struggles when she has to "engage interpersonally," the consultants found her not significantly limited in her ability to maintain socially appropriate behavior and only moderately limited in her ability to interact with the general public.  (*Id.*).  As such, the ALJ's finding that these opinions are only "somewhat persuasive" is understandable since the consultants did not use specific language about Plaintiff's abilities or cite objective evidence that supported their conclusions.

Although the ALJ did not use the "magic word" supportability to describe her comparisons of the limited treatment records with the consultants' opinions, her reasoning addressed such, because the consultants reviewed the same medical records.  *See Sasha M. v. Comm'r of Soc. Sec.,* No. 2:22-CV-2101, 2023 WL 1793536, at *7 (S.D. Ohio Feb. 7, 2023), *report and recommendation adopted,* No. 2:22-CV-2101, 2023 WL 6383450 (S.D. Ohio Sept. 29, 2023) ("[T]he ALJ cited to the same records upon which the state agency psychologists based their opinions.… In other words, she considered supportability and the opinion's reference to diagnostic

14

techniques, data collection procedures/analysis, and other objective medical evidence") (internal quotations omitted).

While this analysis was likely enough to satisfy the regulations, the ALJ went further and evaluated the inconsistencies between the state agency psychology consultants' opinions and later medical and mental health records that were unavailable to them. *See* 20 C.F.R. § 404.1520c(b)(2). In particular, the ALJ discussed an appointment on January 20, 2022, where Plaintiff exhibited normal behavior and thought content, no mental health complaints, and an "entirely" negative screening for depression. (R. at 26, citing R. at 702–07). And again, the ALJ concluded that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 26). By highlighting these mental health records and noting these inconsistent reports and records, the ALJ properly evaluated the consistency of the cumulative record against the state agency psychology consultants' opinions.

Therefore, the ALJ adequately considered both the supportability and consistency of the state agency psychology consultants' opinions and explained the evidence underlying her finding that their opinions were only "somewhat persuasive." (R. at 28).

### 2. Limitations on Social Interactions

Plaintiff also alleges that the ALJ's opinion failed to include the state agency psychology consultants' recommendation that Plaintiff should be limited to minimal and superficial interactions with others. (Doc. 10 at 6). In particular, Plaintiff argues that by limiting Plaintiff to "occasional" interactions with others, the ALJ failed to sufficiently consider for the state agency reviewers' opined limitation of "superficial" interactions. (*Id.* at 8, citing R. at 22).

Plaintiff is correct in that an ALJ may not replace a "superficial" social functioning limitation with an allowance for "occasional" interactions without explanation. *Runyon v. Comm'r of Soc. Sec.,* No. 2:20-CV-3820, 2021 WL 3087639, at *4 (S.D. Ohio July 22, 2021), *report and recommendation adopted,* No. 2:20-CV-3820, 2021 WL 3489615 (S.D. Ohio Aug. 9, 2021); *see also Myers v. Comm'r of Soc. Sec.,* No. 2:19-CV-2060, 2019 WL 7046408, at *7 (S.D. Ohio Dec. 23, 2019), *report and recommendation adopted,* No. 2:19-CV-2060, 2020 WL 880778 (S.D. Ohio Feb. 21, 2020) (determining the ALJ provided sufficient reasoning for the exclusion of superficial interactions where the ALJ reviewed the plaintiff's ability to get along with others, take care of his son, and cooperate with medical providers).

But an ALJ is "charged with assessing a claimant's RFC based on all of the relevant medical and other evidence of record" and does not have to adopt a state agency psychology consultant's opinion "verbatim," even if they give that opinion "great weight." (R. at 28); *Reeves v. Comm'r of Soc. Sec.,* 618 F. App'x. 267, 275 (6th Cir. 2015) (quoting *Harris v. Comm'r of Soc. Sec.,* No. 1:13-CV-00260, 2014 WL 346287, at *11 (N.D. Ohio Jan. 30, 2014)). Furthermore, an ALJ's substitution of "occasional" interactions for "superficial" interactions is sufficient so long as the ALJ provides other qualitative limitations on social interactions, such as a restriction of no tandem tasks. *Modro v. Comm'r of Soc. Sec.,* No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019), *report and recommendation adopted,* 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019) (finding an ALJ reasonably accounted for the Plaintiff's limitations where "occasional, superficial contact" was qualified as including "no tandem assignments"); *Jared W. v. Comm'r of Soc. Sec.,* No. 2:22-CV-01786, 2022 WL 17842947, at *3–4 (S.D. Ohio Dec. 22, 2022), *report and recommendation adopted,* No. 2:22-CV-1786, 2023 WL 1960600 (S.D. Ohio Feb. 13, 2023) (holding that a restriction on tandem tasks, considered with Plaintiff's ability to live

and work with others and cooperate with mental examinations, was sufficient for substituting "occasional" interactions with "superficial" interactions); *cf. Bashaw v. Comm'r of Soc. Sec.,* No. 1:23-CV-00244, (S.D. Ohio Oct. 31, 2023) (reversing and remanding where the ALJ left out multiple limitations recommended by the state agency psychological consultants without explanation, despite finding the consultants' opinions "internally consistent and well-supported" by the evidence in the record).

In this case, even though the ALJ found the consultants' opinions only somewhat persuasive, the ALJ was still required to address both quality and quantity of social interactions in determining Plaintiff's RFC, and the ultimate question before this Court is whether the ALJ "meaningfully considered the type of interactions Plaintiff can have in a work environment." *Andrea B. v. Comm'r of Soc. Sec.,* No. 3:22-CV-055, 2023 WL 128288, at *7 (S.D. Ohio Jan. 9, 2023).

Here, the Court finds the ALJ did so. As stated, the ALJ found Dr. Murry-Hoffman's and Dr. Whateley's opinions "somewhat persuasive." (R. at 28, citing R. at 163–184, 187–206). The ALJ explained that the term "minimal and superficial interactions with others" used by the state agency psychology consultants was "nonspecific" and did not "usefully convey[] the extent of [Plaintiff's] limitations." (*Id.*). The ALJ therefore rejected that limitation. (*Id.*). While Plaintiff takes issue with this language, the ALJ's characterization is supported by the record.

As discussed above, the consultants' opinions were based largely on Plaintiff's own subjective reports with no supporting references to her treatment records. (R. at 171, 182, 194, 204). The consultants also failed to explain discrepancies between their findings concerning Plaintiff's social abilities and their conclusion that Plaintiff should be limited to superficial

interactions.  (*Id.* (finding Plaintiff not significantly limited or just moderately limited in social interactions but concluding she was capable of only "minimal and superficial interactions")).

Because the consultants did not provide specific evidence to support their conclusions regarding Plaintiff's social abilities, the ALJ turned to objective medical evidence in the record to assist in crafting the RFC.  Based on these records, the ALJ concluded that Plaintiff has a history of anxiety and depression that is reflected in the record.  (R. at 25, citing R. at 411–445, 619–629). The ALJ highlighted that Plaintiff required "significant" prompting to engage with a mental health provider and may struggle with comprehension, although records on this point were "unclear."  (R. at 25, citing R. at 635, 617).

On the other hand, the ALJ discussed evidence in the record of Plaintiff's social abilities that demonstrates that during the time period at issue, Plaintiff was capable of providing care to her grandmother, working part-time, engaging in hobbies, texting her friends, and seeking treatment from healthcare practitioners.  (R. at 27; *see e.g.*, R. at 53–56, 59–60, 602, 615, 618, 622, 625, 629, 633–634, 635, 640, 692, 696, 678, 702, 708, 711, 715, 719, 732, 735, 738, 742, 756, 765, 768, 771–772).  For example, during one medical appointment, Plaintiff described helping her mother clean the house and care for her grandmother, and Plaintiff also cooperated with a social worker to create a list of ways she could be helpful at home.  (R. at 629, 633–634, 635).  At the disability hearing, Plaintiff testified about her part-time work and stated that while her hours were limited due to her health concerns, she continued to work up to 12 hours a week during the relevant time period.  (R. at 53–56, 59–60).  Plaintiff's limited mental health records further show her ability to engage in hobbies, such as reading, drawing, and completing crafts.  (R. at 622, 625, 678).  The record also shows numerous medical appointments initiated by Plaintiff where she sought medical advice and treatment.  (R. at 602, 615, 618, 629, 640, 692, 696, 702, 708, 711, 715,

719, 732, 735, 738, 742, 756, 765, 768, 771–772).  Based on this cumulative evidence, the ALJ found that Plaintiff's had "greater [social] functioning ability than otherwise alleged." (R. at 27).

Then, after comparing Plaintiff's subjective reports against the objective treatment evidence available in the record, the ALJ determined that Plaintiff could "perform simple routine tasks, with occasional interaction with the public, coworkers and supervisors" with no "tandem tasks" and only instructions of "more of a verbal or demonstration nature." (*Id.*).  This determination includes quantitative limitations on Plaintiff's social capacity by restricting her to only occasional interactions, and it includes qualitative limitations by excluding tandem tasks altogether. *See Dickinson v. Comm'r of Soc. Sec.,* No. 2:19-CV-3670, 2020 WL 4333296, *12 (S.D. Ohio July 28, 2020), *report and recommendation adopted,* No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (finding that a restriction on tandem tasks is a "qualitative limitation on social interaction").

The ALJ's conclusions are also supported by the consultants' findings, despite Plaintiff's arguments otherwise.  The consultants found Plaintiff "not significantly limited" in her ability to interact with her coworkers or peers.  (R. at 171, 182, 194, 204).  However, they did find her "moderately limited" in her ability to interact with the general public.  (*Id.*).  Accordingly, the ALJ limited Plaintiff to "occasional" interactions with the general public, coworkers, and supervisors. (R. at 22).  The state agency psychology consultants then found that Plaintiff was "moderately limited" in her ability to accept instructions and respond appropriately to criticism from supervisors.  (R. at 171, 182, 194, 204).  Therefore, the ALJ determined that instructions to Plaintiff should only be given verbally or demonstratively, and Plaintiff should be limited to "simple, routine tasks" with "no tandem tasks."  (R. at 22).

19

These conclusions show that the ALJ carefully considered the state agency psychology consultants' opinions against other evidence in the record when determining the Plaintiff's RFC for social interactions. As such, the Undersigned finds that substantial evidence supports the ALJ's decision.

**B.      Mark Weaver, M.D.**

The ALJ found Dr. Weaver's opinion on Plaintiff's ability to do work related physical activities "unpersuasive." (R. at 28). When evaluating Dr. Weaver's opinion, the ALJ determined:

> The [ALJ] has also considered the medical consultative examiner opinion from Dr. Weaver who opined: that all [Plaintiff]'s problems were compounded by her being overweight and, "would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, reaching, climbing, squatting, stooping, crouching, kneeling, crawling, lifting, carrying and travel" and "would probably be able to perform physical activities involving handing objects but without force gripping of the right hand, speaking, hearing, and following directions" (Exhibit 5F, page 7). The [ALJ] has found Dr. Weaver's assessment unpersuasive. Dr. Weaver's limitations are unspecified, and lack an adequate function by function assessment of what [Plaintiff] can still do despite her impairment. Furthermore, Dr. Weaver's statements, are generally unsupported by the record of evidence as a whole which only showed intermittent physical examination findings. Indeed, [Plaintiff] continued to work throughout the period albeit at a parttime level, as well was able to help provide care to her grandmother, and maintaining independence with activities of daily living and hobbies. In this regard, deference has been given to the reduce range of light exertion limitations as reflected in the State agency medical consultant assessments identified above.

(R. at 28).

Plaintiff argues that the ALJ engaged in an "extremely conclusory analysis" concerning the consistency and supportability of Dr. Weaver's opinion. (Doc. 10 at 12). Plaintiff further alleges that the ALJ's findings are in "direct opposition to Dr. Weaver's findings, as well as the remainder of the record." (*Id.*). As such, Plaintiff contends that "[h]ad the ALJ properly evaluated all of the opinions on [Plaintiff's] behalf, the ALJ may have found their opinions to be more persuasive." (*Id.* at 14). Yet this argument asks the Court to ignore the ALJ's findings and reweigh

20

the evidence, which the Court cannot do. *Haun v. Comm'r of Soc. Sec.,* 107 F. App'x. 462, 465 (6th Cir. 2004). The singular question before the Court is whether the ALJ's decision "was made pursuant to proper legal standards." *Winn,* 615 F. App'x. at 320. The Undersigned finds that it was.

### 1. Supportability

The Undersigned finds that the ALJ properly evaluated the supportability of Dr. Weaver's opinion by highlighting its lack of objective medical evidence and specificity. (R. at 28). The ALJ found Dr. Weaver's opinion "unpersuasive" and stated that it was "unsupported," because the record contained only "intermittent physical examination findings." (R. at 28, citing R. at 662–68). In total, Dr. Weaver's opinion cited only two medical records that he reviewed: an emergency department report dated April 26, 2020, and a medical note dated April 30, 2020. (R. at 667, citing R. at 538–554 (stating Plaintiff had "5/5 strength in bilateral extremities" and a "steady gait," despite Plaintiff's report of pain when she bears weight on her left leg), 598–601 (noting just "tenderness" in Plaintiff's left leg, ordering x-rays, discharging Plaintiff, and instructing Plaintiff to return to a walk-in clinic if pain worsened).). However, despite listing these records in his report, Dr. Weaver never refers to them in his assessment. (R. at 662–68).

Consequently, as the ALJ highlighted in her decision, determining the source of Dr. Weaver's opinions proves challenging because he failed to connect any of his limitations to Plaintiff's medical history contained in these records. (R. at 28, citing R. at 667). Rather, all of Dr. Weaver's conclusions were seemingly based on his own examination of Plaintiff and her subjective reports. (R. at 667). Notably, Dr. Weaver clarifies at the end of his opinion that he has not provided "care" to Plaintiff and only saw her on one occasion before completing his assessment. (*Id.*). While Dr. Weaver opines that Plaintiff would "probably" be limited in

numerous ways based on this one-time evaluation, he does not explain the reasoning behind his opinions.  (*Id.*).  The ALJ noted this flaw in her decision, referring to his findings as "unspecified" and lacking "an adequate function by function assessment."  (R. at 28, citing R. at 667).  Even assuming Plaintiff's subjective reports supported Dr. Weaver's conclusions, the ALJ quoted Dr. Weaver's statement that Plaintiff was a "poor medical historian" during his examination, supporting the ALJ's conclusion that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. at 24–26, citing R. at 703–04, 756, 775–77, 855, 859–60, 862–63, 867).

As such, the ALJ's decision, when read as a whole, sufficiently articulates why she found Dr. Weaver's opinion "unpersuasive" and "unsupported," and the ALJ properly evaluated the supportability factor.  (R. at 28); *see Hill v. Comm'r of Soc. Sec.,* 560 F. App'x 547, 551 (6th Cir. 2014) (recognizing that an ALJ's decision must be read as a whole).

## 2. Consistency

Next, Plaintiff argues that the ALJ failed to consider fully the consistency of Dr. Weaver's opinion with the rest of the record.  (Doc. 10 at 12–13).  Plaintiff also points to other evidence that, she argues, contradicts the ALJ's RFC determinations.  (*Id.* at 13–14).  Although other evidence in the record could have supported a more restrictive RFC, the Court must not substitute its judgment for the ALJ's if the decision was supported by substantial evidence.  *Daryl H. v. Comm'r of Soc. Sec.,* No. 2:22-CV-3139, 2023 WL 6290068, at *5–6 (citing *Warner v. Comm'r of Soc. Sec.* 375 F.3d 387, 390 (6th Cir. 2004)).  In her decision, the ALJ determined that Dr. Weaver's opinion was overall "unpersuasive" because his findings were "generally unsupported by the

record of evidence as a whole," which showed only "intermittent physical findings." (R. at 28, citing R. at 662–68).

This characterization is supported by the state agency medical consultants, who concluded after reviewing Plaintiff's medical records that Dr. Weaver's opinion "is an overestimate of the severity of the individual's restrictions/limitations" and that his findings are only "partially consistent" with the record as a whole. (R. at 28; *see* R. at 168, 179, 191, 201). The ALJ also found Dr. Weaver's opinions inconsistent with other evidence of Plaintiff's daily activities. For example, the ALJ highlighted that Plaintiff managed to work part-time throughout the relevant time period. (R. at 23, 28; citing R. at 53–56, 59–60). Then, the ALJ described Plaintiff's ability to care for her grandmother and maintain independence. (R. at 28; R. at 25, citing R. at 629, 635, 678, 679). The ALJ also noted Plaintiff's engagement in various hobbies. (R. at 28; citing R. at 622, 625, 678). This evidence all supports the ALJ's conclusions that Plaintiff has "greater functional ability than otherwise alleged." (R. at 26).

The ALJ supported that conclusion with objective medical evidence in the record that is also inconsistent with Dr. Weaver's opinion. In particular, the ALJ highlighted emergency department notes stating Plaintiff had a "steady gait" and "5/5 lower extremity strength," despite her reports of left leg pain. (R. at 23, citing R. at 538–41). Other records reviewed by the ALJ indicate Plaintiff had a "normal gait" and "5/5 muscle strength with the exception of an untested right arm" in January 2021. (R. at 23, citing R. at 774–75). The ALJ also noted that Plaintiff reported "40% improvement in knee pain" to her physical therapist, even after Plaintiff had infrequent attendance at physical therapy appointments. (R. at 23, citing R. at 862–63). These medical records contrast with Dr. Weaver's single examination, where he found Plaintiff had a "stiffened gait and left limp." (R. at 664).

While Plaintiff challenges the RFC determination based on Plaintiff's own reports and the ALJ's discussion of Dr. Weaver's opinion, "it is not in this Court's province to reweigh the evidence or decide questions of credibility." *Molly M. v. Comm'r of Soc. Sec.,* No. 3:20-CV-274, 2022 WL 336412, at *5 (S.D. Ohio Feb. 4, 2022). The ALJ properly evaluated Dr. Weaver's opinion for consistency with the rest of the record, and substantial evidence supports her decision. As such, the Undersigned finds that the ALJ's decision met the requirements of the regulations. *See* 20 C.F.R. § 404.1520c(b)(2).

### C.    Gregory Johnson, M.D.

When evaluating Dr. Johnson's opinion, the ALJ determined:

> The [ALJ] has also considered the psychological consultative examiner opinion from Dr. Johnson who opined: [Plaintiff] has elevated risk for dysfunction in remembering and carrying out instructions; [Plaintiff] has elevated risk for dysfunction in maintaining attention and concentration and maintaining pace and persistence in both simple and multi-step tasks in the workplace; has elevated risk for inappropriate responses to expected interactions with coworkers and to the expected scrutiny from supervisors; and has a mostly elevated risk for inappropriate responses to expected workplace pressures (Exhibit 6F, pages 10-11). The [ALJ] has found Dr. Johnson's assessment unpersuasive. Dr. Johnson's limitations are unspecified, and lack an adequate function by function assessment of what [Plaintiff] can still do despite her impairment. Indeed, the characterization of [Plaintiff]'s limitations in terms of "elevated risk" are inconsistent with policy compliant language as reflected in the assessed residual functional capacity above. In this regard, greater deference has been given to the State agency psychological consultant's assessment identified and discussed above.

(R. at 28).

According to Dr. Johnson's report, he did not review any of Plaintiff's medical records, and his conclusions are therefore based on his one-time examination of Plaintiff and her subjective reports of her symptoms. (R. at 675–684). Dr. Johnson opined that Plaintiff would have an "elevated risk for dysfunction in carrying out instructions given to her in the workplace," "for dysfunctions in maintaining pace and persistence in both simple and multi-step tasks," and "for

inappropriate responses to expected interactions with coworkers and to the expected scrutiny from supervisors." (R. at 683–84). Dr. Johnson also concluded that Plaintiff would have a "mostly elevated risk for inappropriate responses to expected workplace pressures." (R. at 684).

The ALJ found these opinions to be "unpersuasive" based on the lack of specificity, lack of an adequate function-by-function assessment, and lack of "policy compliant language." (R. at 28, citing R. at 683–84). Plaintiff argues that the ALJ did not properly analyze Dr. Johnson's opinions for supportability or consistency as required by the regulations and merely found them unpersuasive for "vocabulary usage." (Doc. 10 at 14, citing R. at 28).

### 1. Supportability

In evaluating the supportability of a medical opinion, an ALJ must evaluate the objective medical evidence, as well as the support for that opinion and strength of the evidence on which the medical source based their conclusions. *Stacie B. v. Comm'r of Soc. Sec.,* No. 2:21-CV-4650, 2022 WL 1793149, at *6 (S.D. Ohio, June 2, 2022), *report and recommendation adopted,* No. 2:21-CV-4650, 2022 WL 2237057 (S.D. Ohio June 22, 2022). Only "a minimum level of articulation is needed to provide sufficient rationale for a reviewing court." *Id.* (internal quotations omitted). Nevertheless, an ALJ is required to "build an accurate and logical bridge between the evidence and [her] conclusion." *Timmons v. Comm'r of Soc. Sec.,* No. 2:19-CV-3, 2019 WL 5445510, at *3 (S.D. Ohio Oct. 24, 2019).

Here, the Court agrees with Plaintiff that simply describing Dr. Johnson's opinion as "unspecified" and lacking in "policy compliant language" is inadequate. (R. at 28). While Dr. Johnson's opinions may be so unspecified as to render the ALJ unable to evaluate supportability, the ALJ did not explain such logic here. *Howard H. v. Comm'r of Soc. Sec.,* No. 2:20-CV-4932, 2022 WL 765217, at *3–4 (S.D. Ohio Mar. 14, 2022) (finding the ALJ's opinion lacking regarding

supportability where the ALJ only described a medical opinion as "vague" and lacking "vocationally relevant terms"). Although the ALJ did additionally note that Dr. Johnson's opinion lacked a "function by function assessment," that language alone is not "sufficient rationale for a reviewing adjudicator or court" to determine if the ALJ's decision is supported by substantial evidence. (R. at 28); *see Miles v. Comm'r of Soc. Sec.,* No. 3:20-CV-410, 2021 WL 4905438, at *3 (S.D. Ohio Oct. 21, 2021).

This error, however, is harmless. Plaintiff argues that had the ALJ properly considered the supportability of Dr. Johnson's opinion, "the ALJ may have found [his] opinions to be more persuasive and constructed a much more restrictive residual capacity." (Doc. 10 at 14). But Plaintiff does not identify any material limitations that the ALJ would have included had she properly analyzed Dr. Johnson's opinion. The Undersigned also cannot identify how Plaintiff was prejudiced or deprived of a substantial right. *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742,746 (6th Cir. 2007). Even if the ALJ had given more weight to Dr. Johnson's opinion, the opinion still lacked vocationally relevant language and a function-by-function assessment that would result in a more limited RFC than the one the ALJ crafted: "occasional interaction with the public, coworkers, and supervisors" with "no tandem tasks" and instructions "of a verbal or demonstration nature." (R. at 22); *see Ware v. Comm'r of Soc. Sec.,* No. 2:17-CV-01015, 2019 WL 696945, at *11 (S.D. Ohio Feb. 20, 2019), *report and recommendation adopted,* No. 2:17-CV-1015, 2020 WL 2085200 (S.D. Ohio Apr. 30, 2020) (finding that where a plaintiff challenges an ALJ's mental health limitations, but offers no additional restrictions that the ALJ should have concluded, plaintiff's challenge is "meritless").

For example, Dr. Johnson opined that Plaintiff would have an "elevated risk" for inappropriate social interactions with coworkers and supervisors. (R. at 684). But the ALJ

accounted for such a limitation in restricting Plaintiff to only "occasional" interactions with others.
(R. at 22).  Dr. Johnson also found that Plaintiff would have an elevated risk for "dysfunctions in
maintaining pace and persistence in both simple and multi-step tasks" and "dysfunctions in
carrying out instructions."  (R. at 683–84).  The ALJ similarly addressed these limitations by
stating that Plaintiff should only perform "simple routine tasks," "no tandem tasks," "no fast-paced
production such as assembly line or work where machine sets the pace," "no strict production
requirements," and receive instructions of only a verbal or demonstrative nature.  (R. at 22).  Next,
Dr. Johnson concluded that Plaintiff would have a "mostly elevated risk for inappropriate
responses to expected workplace pressures," which the ALJ provided for with limitations to
"simple routine tasks," "no tandem tasks," "occasional decision making… [and] occasional
changes in the work setting," "no strict production requirements," verbal and demonstrative
instructions, and only "occasional" interactions with coworkers, supervisors, and the general
public.  (R. at 22).  Notably, the vocational expert at Plaintiff's disability hearing did not opine on
any limitations proposed by Dr. Johnson and did not reference his assessment in any of the
proposed vocational hypotheticals.  (R. at 60–75).

In sum, the ALJ's decision accounted for the limitations upon which Dr. Johnson opined,
and Plaintiff has not suggested any additional restrictions that the ALJ would have included in the
RFC had she given Dr. Johnson's opinion more weight.  Therefore, the ALJ committed harmless
error in analyzing Dr. Johnson's opinion for supportability, and reversal is not warranted.  *See
Howard H.,* 2022 WL 765217, at *4 (finding a remand unwarranted where the medical opinion at
issue "would not support a substantive finding that Plaintiff has any lesser residual functioning
capacity than the ALJ determined").

### 2.  Consistency

Plaintiff also argues that the ALJ did not properly evaluate Dr. Johnson's opinion for consistency with the rest of the record. (Doc. 10 at 14). The Court disagrees. Although the ALJ did not use the word "consistency" in her discussion of Dr. Johnson's conclusions, she compares Dr. Johnson's findings to other evidence in the record elsewhere in her opinion. *See Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (recognizing that an ALJ's decision must be read as a whole).

In particular, the ALJ noted Dr. Johnson's conclusions regarding Plaintiff's elevated risk for inappropriate responses to coworkers and supervisors, dysfunction in maintaining attention and concentration and maintaining pace and persistence, and dysfunction in remembering and carrying out instructions. (R. at 26, citing R. at 684–84). The ALJ then noted that despite these conclusions, Dr. Johnson found Plaintiff "is able to attend to personal hygiene, [work] for 2-3 hours per day," cook, and engage in multiple hobbies. (R. at 25–26, citing R. at 678–79). In addition to discussing Dr. Johnson's findings, the ALJ also cited to other objective medical evidence in the record that disputes them. (R. at 25–26). For example, the ALJ highlighted multiple appointments in 2020 where Plaintiff showed "normal mood," "cooperative behavior," and the ability to help with chores, care for her grandmother, and use coping skills. (R. at 25–26, citing R. at 541–42, 615–17, 629, 635, 702–07).

As such, the Undersigned finds that the ALJ properly evaluated the consistency of Dr. Johnson's opinion by referencing other evidence from medical and nonmedical sources.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: November 3, 2023                    /s/ Kimberly A. Jolson
                                          KIMBERLY A. JOLSON
                                          UNITED STATES MAGISTRATE JUDGE